Common Pleas Court of Franklin County.

FORREST L. DUNCAN V. ZULA LINTON, ADMRX., ETC., ET AL.

Decided September 21, 1928.

*Vorys, Sater, Seymour & Pease,* for plaintiff.
*C. A. Eberly* and *Joseph Howard,* for defendants.
*Henry Linton,* for administratrix.

KING, J.

The plaintiff, Forrest L. Duncan, seeks in his petition to have engrafted a trust upon an undistributed portion of a fund now in the custody of Zula Linton, as administratrix *de bonis non,* said fund derived from an insurance policy issued to Fred Duncan, a deceased soldier of the World War and a son of this plaintiff.

The plaintiff relies upon a letter dated January the 20th, 1918, written by the "soldier boy" to his grandmother.

The defendants claim that the court is without jurisdiction to hear the matter, in that the soldier boy had not complied with the rules and regulations of the Government prescribed in the issuance of War Risk Insurance, in that he had not designated in his application a second beneficiary, and that the language of the letter of January 20, 1918, from the soldier boy to his grandmother is not sufficient to warrant the creation of a trust.

Upon the hearing, the facts disclosed that Fred Duncan's mother and father were divorced shortly after his birth; that both father and mother remarried shortly thereafter; the mother moved to somewhere out West; that the father moved to Illinois; that half-brothers and sisters were born of each of the marriages of father and mother; that Fred Duncan never saw his mother until after his enlistment in the army, and then upon one occasion; that he had never corresponded with his mother; that the plaintiff, Forrest Duncan, is the son of Minerva Lee Duncan; that her husband's name was Gideon B. Duncan, who died in February, 1910. Minerva L. Duncan, after the death of Gideon B. Duncan, married one Hiram B. Miller, in 1913. Hiram Miller died in 1913. Minerva L. Miller (Duncan) was present at the birth of Fred Duncan on January 3, 1896.

The evidence disclosed that Fred Duncan lived with

Minerva L. Miller practically from the date of his birth up until the time of his enlistment in the army; that she supported and educated him; that he looked upon her as his mother, and that he believed her to be his mother until he was practically 17 years of age; that he always spoke of Gideon B. Duncan and Minerva L. Miller as "Papa and Mama." He was 17 years old when he learned that they were his grandparents.

The evidence disclosed that he visited his father, the plaintiff, in Illinois for a week after his enlistment in the army, and that during his services over-seas he corresponded with the plaintiff, his father, a number of which letters were introduced in evidence.

While Fred Duncan was a member of Company I, 166th Infantry, he applied for and there was issued to him insurance by the Bureau of War Risk Insurance; that while in the line of duty somewhere in the Argonne Forest, Fred Duncan was mortally wounded.

It appears that during his service he had made four applications for insurance, that one is missing from the records of the Government files. The files of the Government show copies of two separate applications under date of October 23, 1918, each for five thousand dollars. In our opinion, these are separate and distinct applications.

On November 22, 1917, is noted: "Insurance application correction," exhibit 106 of Government papers, which states that the application is "Incorrect in the item or items checked below." The check mark around the items referred to indicates the error called to attention was failure to give the relationship of second beneficiary; also failed to give correct name of first beneficiary, and that second beneficiary is incorrect in name. The application for insurance under date of October 23, 1917, bore the name of Mrs. M. L. Miller written in perhaps by one of the officers, but not in the handwriting of Fred Duncan.

The corrected application, Government papers 106, dated November 26, 1917, as shown by the date upon its face, was received at the Bureau of War Risk Insurance January 18, 1918, two days before he wrote to his "mother," Mrs. Miller, the letter relied upon by plaintiff, and in which he says, "I had a mistake in my insurance, I didn't

give the correct name of the first beneficiary, so in sending the correct one in to Washington, D. C., I sent yours in the place of Forrest's name. So that makes you first and him second." In this letter he did not mention the amount of insurance. Doubtless as the writing of the letter indicated, he believed that he had $10,000 insurance. Learning later that he had but five thousand, on April 6, 1918, application was made for five thousand. On this application is written, "Additional, total $10,000," and named Minerva Duncan as his beneficiary, which, of course, was not her name, or the name given in the former applications.

On April 9, 1918, Fred Duncan in a letter to his "mother," Defendants' Exhibit 4, said:

"Say Maw, I increased my insurance to ten thousand instead of five thousand now as we only had up to the 12th of April to do this in."

The court is satisfied from all the evidence that the soldier was intending to carry insurance in the sum of $10,000; that he was having difficulty through errors, mistakes and carelessness to obtain that amount. Naturally the organization and prosecution of such a work during the great World War, handled by inexperienced men would be attended by carelessness, mistakes and errors; that applications made by the soldier boy were never received by the Government, or if received by the Government, were mislaid or lost.

On October 18, 1917, in his letter to his "mother" he said:

"Maw, I took a United States insurance out today. I took a five thousand policy out. In case I get killed you get that paid in a sum so much every month."

The Government files contain no application of that date. The court is satisfied that some application was made, and lost or mislaid, or perhaps incorrectly made out, and marked the beginning of several attempts on the part of the soldier boy to have issued to him insurance policy in the amount he desired, and in favor of those whom he desired to be the beneficiaries thereof, which finally resulted in the last issue of insurance of April 6, upon which is written, "Additional, total $10,000."

Upon the question of jurisdiction, we feel that the decision of Judge Sowers, rendered on the 16th day of May, 1927, has correctly disposed of this question. On the trial of the case the genuineness of the letter of January 20 relied on by the plaintiff was questioned. The original letter was lost. Testimony was given by Alfred Linton, Zula Linton, Mrs. Vale, and the plaintiff, Forrest Duncan, that they had seen the letter in question, and that the letter was in the handwriting of Fred Duncan. Kenneth Sater, attorney, who had seen the original letter, made comparison of the letters admitted to have been written by the soldier boy and the handwriting of the lost letter, and testified that in his opinion the handwriting in the lost letter was similar to that of the admitted letters of the soldier boy.

In view of the testimony, the court is satisfied of the genuineness of the letter and of its contents. The question to be determined in the last analysis is, was the language of the letter in question, namely, of January 18, 1918, written by the soldier boy to his grandmother sufficient to warrant a court in engrafting a trust on the undistributed portion of said fund in favor of the plaintiff, Forrest Duncan.

The court has carefully considered the letter, and the following language: "And I have made a mistake in my insurance, I didn't give the correct name of the first beneficiary, so in sending the correct one in to Washington, D. C., I sent yours in the place of Forrest's name. So that makes you first and him second," clearly indicates the intention and desire on the part of the soldier boy that in the event of his death his "mother" should become the first beneficiary and his father, Forrest, should become the second beneficiary. In our opinion, that intention is clearly expressed.

The question is, will a court of equity now carry out the express desire of the soldier boy who was killed in the line of action?

In our opinion, the case of *Walcutt* v. *Walcutt*, 17 Ohio Appellate Reports, page 48, is in point. We quote this pertinent language from the opinion on page 47:

"The letter to the father dated January the 17th, 1918, is not as definite and conclusive as the declaration of trust written by a lawyer. It was written by a layman and expresses the wishes of a soldier."

The Government and society owes a duty indeed to a soldier who has exposed his life in the army for the safety of his Government, and in such matters as this, all that is necessary, or that is required to carry out the wish and purpose of the soldier, is that his real wish should sufficiently appear. The desire of the soldier sufficiently appears in the letter of January 18, 1918.

We feel that the language in the case of *Claffy* v. *Forbes*, 280 Fed., page 233, is applicable to this case:

"Throughout the history of the civilized world, since the decrees of Julius Caesar, the intention and wish of the soldier, with relation to designation of beneficiary or disposition of property, killed in the line of duty, has been carried out when ascertained, whether it was scrawled in the sand with the point of his sword, or written on the scabbard of his sword or his shield (The Customs of Duchy of Burgundy, printed at Dijon, 1694, p. 410; Coutumes de Paris, column 51, Paris, 1714); and remedial justice requires, under the facts in this case, that the designation of the niece in the letter to the mother be established from the date of presentation to and record thereof by the Bureau of War Risk Insurance."

There is no evidence that Fred Duncan ever knew that he had any half-brothers or sisters living. He appreciated that if he died his grandmother would receive $57.50 per month as stated by him in one of his letters to his "mother."

The Federal Statutes that were in force at the time that Fred Duncan made his application for insurance are as follows:

"Sec. 514 uuu. (Act, Sept. 2, 1914, c. 293, Sec. 402. As Amended, Act. Oct. 6, 1917, c. 105, Sec. 2). Terms and Conditions of Insurance Contracts; Publications; Insurance Not Assignable or Subject to Claims of Creditors; To Whom Payable; Payment in Installments; Change of Beneficiaries; Payment Where No Beneficiaries.

"The director, subject to the general directions of the Secretary of Treasury, shall promptly determine upon and publish the full and exact terms and conditions of such contract of insurance. The insurance shall not be

assignable, and shall not be subject to the claims af creditors of the insured, or of the beneficiary. It shall be payable only to a spouse, child, grandchild, parent, brother or sister, and also during total and permanent disability to the injured person, or to any or all of them. The insurance shall be payable in two hundred and forty equal monthly installments. Provisions for maturity at certain ages, for continuous installments during the life of the insured or beneficiaries, or both, for cash, loan, paid-up and extended values, dividends from gains and savings, and such other provisions for the protection and advantage of and for alternative benefits to the insured and the beneficiaries as may be found to be reasonable and practicable, may be provided for in the contract of insurance, or from time to time by regulations. All calculations shall be based upon the American Experience Table of Mortality and interest at three and one-half per centum per annum, except that no deduction shall be made for continuous installments during the life of the insured in case his total and permanent disability continues more than two hundred and forty months. Subject to regulations, the insured shall at all times have the right to change the beneficiary or beneficiaries of such insurance without the consent of such beneficiary or beneficiaries, but only within the classes herein provided. If no beneficiary within the permitted class be designated by the insured, either in his lifetime or by his last will and testament, or if the designated beneficiary does not survive the insured, the insurance shall be payable to such person or persons, within the permitted class of beneficiaries as would under the laws of the state of the residence of the insured, be entitled to his personal property in case of intestacy. If no such person survive the insured, then there shall be paid to the estate of the insured an amount equal to the reserve value, if any, of the insurance at the time of his death, calculated on the basis of the American Experience Table of Mortality and three and one-half per centum interest in full of all obligations under the contract of insurance."

"Sec. 303. If no person within the permitted class of beneficiaries survive the insured, or if before the completion of payments the beneficiary or beneficiaries shall die and there be no surviving person within said permitted class, then there shall be paid to the estate of the insured the present value of the monthly installments thereafter payable under the provisions of this title; Provided, That in cases where the estate of the insured would escheat under the laws of the place of his residence the insurance shall not be paid to the estate of the insured, but shall

escheat the United States and shall be credited to the United States Government life insurance fund or the military and naval insurance appropriation, as may be proper. This section shall be deemed to be in effect as of October 6, 1917."

The Ohio Law of Inheritance that existed at the time of the death of Fred Duncan and at the time of the death, of Minerva L. Miller, the named beneficiary in the insurance policy, was changed in June of 1925. The controlling statute of inheritance in this case will be found at Section 8574 of the General Code of Ohio, before repealed, amended and supplemented by Section 8579 of the General Code of Ohio, as is now in force since June of 1925.

It is the finding and judgment of the court that:

First: The administratrix should be ordered, out of the funds in her hands, to pay the costs of this suit, including reasonable attorneys fees and extraordinary compensation, if any, of administratrix.

Second: To pay to Forrest L. Duncan an amount of money to be computed, without interest, at the rate of $57.50 per month, which is the monthly payment received by Minerva L. Miller, the last payment of which was made to her on November 28, 1924, from December 28, 1924, to date, which, including the September installment, amounts to $2,645.

Third: There is hereby ordered the creation of a trust by which to pay to Forrest L. Duncan the sum of $57.50 on the 28th day of each and every month, after September, 1928, so long as he lives, or until said fund shall have been completely exhausted, and in the event Forrest L. Duncan should die before said fund shall have been exhausted by the monthly payments, then in that event, the trustee should forthwith pay all remaining funds in her hands to the defendants, Stella Margaret Harrington, George H. Harrington, Mildred Doloris Harrington, a minor, and Leroy Calvin Harrington, a minor, share and share alike, for the reason that the last mentioned defendants are the only half-brothers and sisters of Fred L. Duncan, deceased, who were living at the time of his death.